UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL K. YOUNG, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 09 C 4286 |
| | ) | |
| NATIONAL-LOUIS UNIVERSITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

CHARLES P. KOCORAS, District Judge:

This case comes before the court on the motion of Defendant National-Louis University ("NLU") for summary judgment on all claims asserted by Plaintiff Michael Young ("Young") pursuant to Fed. R. Civ. P. 56. For the reasons stated below, the motion is granted.

## BACKGROUND

As a preliminary matter, NLU contends that we should ignore many of Young's statements of fact because they are not in compliance with the Local Rules governing summary judgment motions. On March 30, 2010, the court provided Young with a Local Rule 56.2 statement advising him of the required procedures for answering NLU's motion in accordance with Local Rule 56.1. Despite this notice, many of Young's answers deny the proposed fact without citing to a supporting portion of the

record, contradict Young's own deposition testimony, or contain argumentative commentary. Additionally, many of Young's supplemental statements of fact do not conform to the requirements of Rule 56.1: some statements are devoid of citations to the record while others cite to portions of the record that do not support the fact asserted. While courts must construe pro se pleadings liberally, Young's unrepresented status does not absolve him from compliance with Local Rule 56.1. *See Greer v. Bd. of Ed. of City of Chicago*, 267 F.3d 723, 727 (7th Cir. 2001). A district court may strictly enforce its own local rules with respect to summary judgment motions by considering as admitted all statements uncontroverted by the opposing party. *Patterson v. Ind. Newspapers, Inc.*, 589 F.3d 357, 360 (7th Cir. 2009). Therefore, we will confine our presentation of the relevant background to NLU's uncontradicted facts as well as any additional statements submitted by Young that conform to Local Rule 56.1.

National-Louis University is located in Chicago, Illinois. NLU initially hired Michael Young, an African-American male, as a security officer on March 10, 2003. Though NLU later eliminated Young's campus security guard position, former NLU President Richard Pappas ("Pappas") nevertheless decided to retain Young as an assistant campus services manager for NLU's Chicago campus. As a campus facilities employee, Young assisted university personnel and faculty with setting up classrooms. His primary responsibility was to input faculty members' requests for classroom

equipment into NLU's computer system. Initially, Young's supervisors noted that he performed adequately in his new job – Associate Director of Facilities Dick Sterett ("Sterett") noted that Young met the basic expectations of his duties in his 2006-2007 performance review.

During his time at the Chicago campus, Young had an oftentimes contentious relationship with NLU professor Thomas Slawson ("Slawson"). From May 15 to May 18, 2007, Slawson emailed Young several times to request his assistance in scheduling a room and procuring some media equipment for classes he would be teaching. After Slawson expressed frustration with the manner in which Young handled his request, Young met with his supervisor Sterett to discuss the situation. Sterett instructed Young not to respond verbally or by email to any criticism of his work performance and to report all complaints about staff or faculty to management for resolution. Young responded that he did not agree with Sterett's instructions and refused to follow his directions.

Finding his superiors' response to the Slawson problem inadequate, Young decided to take a different approach. On May 22, after receiving another complaint from Slawson via email, Young sent an email directly to Slawson in which he stated "[i]t's been said: 'that a lie can travel half way around the earth, before the truth can put it[s] shoes on' Mr. Slawson[.]" Later that day, Sterett again met with Young to remind him

of the proper procedure for responding to faculty complaints. Sterett told Young not to send emails to NLU employees who complained about the manner in which he performed his duties.

Three days later, on May 25, Young sent an email discussing his various interactions with Slawson to NLU President Pappas, Human Resources employee Erin Haulotte ("Haulotte"), NLU's Executive Director of Legal Affairs McCeil Johnson ("Johnson"), and various other administrators. The same day, Johnson informed Young that NLU's President had asked her to work directly with Young to resolve the situation. To that end, Johnson requested that Young submit a confidential written narrative describing his encounters with Slawson and arranged to meet with Young the following week. In his report to Johnson, Young stated that his supervisors' unsatisfactory approach to the Slawson issue was the product of racial discrimination. Johnson later met with Young and requested that he inform her of any future exchanges between him and Slawson. She also told Young that he could call the police if he felt threatened by Slawson in the future. On June 1, Young wrote Johnson to inform her that he had encountered Slawson on campus and had exchanged a peaceful greeting with him. Johnson then concluded her investigation of Young's complaint.

Another incident involving Young and Slawson occurred on July 18, 2007. That day, Slawson showed up in Young's office twice to complain that audiovisual

equipment he requested had not been placed in his classroom. During this encounter, Slawson stood over a seated Young and yelled at him. Once Slawson had left the office, Young called the police. After the incident, Haulotte instructed Young that he should have no more direct contact with Slawson and gave him a phone number to call if another encounter occurred. Haulotte also told Young that Slawson had been instructed to limit his conversations with him and to address any other equipment problems with Young's supervisor. Additionally, Haulotte disciplined Slawson for his conduct toward Young soon after the July 18 incident but did not inform Young about the action taken until February or March 2008.

Young had two more encounters with Slawson in August 2007 and March 2008. On August 8, 2007, Slawson returned to Young's office for the last time to inquire about an equipment request. After briefly discussing the equipment issue with Slawson, Young sent an email to Johnson and Haulotte complaining that Slawson's request constituted racial harassment. On March 18, 2008, the two men briefly spoke on the phone. Young had no further contact with Slawson after that date.

Young also had interpersonal issues with other NLU employees including his supervisors. On July 31, 2007, Young met with NLU's Vice President of Human Resources, Tom Bergmann ("Bergmann") and NLU's Vice President of Operations, Bill Roberts ("Roberts"), to discuss the University's Policy on Acceptable Use of NLU

Information Technology. Bergmann and Roberts asked to meet with Young to discuss the religious overtones of his campus-wide communications. Prior to the meeting, Johnson provided Young with a copy of the Policy and a memorandum stating that he was welcome to use NLU IT systems for business purposes so long as he conformed his conduct to the Policy. Johnson also notified Young that "failure to comply with the NLU Policy on Acceptable Use of NLU Information Technology will result in disciplinary action up to and including possible termination of employment." Young reviewed the policy before attending the meeting.

At some point during the meeting, Young walked out in spite of Roberts' request that he remain. As a result of this unauthorized departure, Young received a final disciplinary write-up for insubordination on August 2 and was notified that his insubordinate behavior must cease. Though Young had never received a disciplinary letter before this incident, this was not the first time that Young had acted in a defiant manner at NLU: the write-up also referenced a previous incident of insubordination in May 2007 when Young refused to participate in a training session. Young submitted a rebuttal to the final written warning to NLU Human Resources on August 6. Haulotte informed Young that she had reviewed the rebuttal and placed it in Young's personnel file; she also reiterated that "future occurrences of similar behavior may result in further disciplinary action up to and including termination." On August 9, Roberts sent an

email to Young in which he confirmed that future violations of NLU's IT policy "could result in further disciplinary action up to and including termination." Young attributed his reprimand to some form of racial animus on the part of his supervisors. On September 11, 2007, he filed a charge with the Equal Employment Opportunity Commission ("EEOC") alleging that NLU's disciplinary action constituted racial discrimination and retaliation.

Young also questioned his supervisors' motivations with respect to their response to his complaints about conditions in his office. On May 26, 2007, a flood occurred on the sixth floor of NLU's Chicago campus. The damage was extensive on the sixth and fifth floors of the building but the third floor on which Young's office was located suffered only minor damages. Despite the limited damage, Young and student employees who shared the same office space in Suite 3114 complained to NLU about the state of their office. After receiving the complaints, Johnson toured Suite 3114. She directed NLU staff to remove a dehumidifier and a garbage can full of stagnant water from the office. She also requested that an environmental mold sampling of Suite 3114 be conducted by Carnow, Conibear & Associates, Ltd. ("CCA") on July 11. CCA found that the levels of mold spores were not affecting the indoor air quality of Suite 3114 in any significant way.

NLU eventually decided to perform repairs on Young's office. On August 16, Roberts notified Young and the rest of the employees in his office that they would be relocated while flood-related repairs were completed. Roberts decided to move Young, his brother Patrick (who also worked in campus services at NLU), and some student workers to a room on the fifth floor. Because the room on the fifth floor only had enough outlets and phone lines for two work stations, Roberts decided to move a third employee, Akbar Khan, to a different room than Young.

Sometime in August 2007, NLU President Pappas learned that Young and his brother Patrick had made several complaints that they were being treated differently because of their race at NLU. On August 16, 2007, Pappas and Johnson informed Young that NLU would be investigating each of the issues raised. In conducting her examination of Young's allegations, Johnson interviewed several members of the NLU administration, reviewed various NLU policies, and examined relevant email correspondence. On August 31, Johnson and Pappas met with Young to discuss the results of the investigation. Johnson informed Young that she found no evidence of racial discrimination or retaliation in NLU's response to the Slawson situation, allowing Young to remain in Suite 3114 after the flood, reprimanding Young for his behavior during the July 31 meeting with Bergmann and Roberts, and moving Young and his brother to a different room than Akbar Khan after the flood. Pappas also used the

meeting as an opportunity to outline NLU's expectations for Young's behavior going forward.

Over the course of the meeting, Pappas and Johnson observed what they considered to be Young's condescending and disrespectful behavior toward them. Young's attitude prompted Pappas to impose a three-day paid suspension and a 10-day unpaid suspension as a result of his behavior. On September 7, Young received a memorandum regarding NLU's mandatory expectations for his future performance including respecting his supervisors, utilizing the appropriate chain of command for resolving complaints, and conforming his conduct to NLU's policies and procedures. On September 25, 2007, he consented to the requirements of the expectations memorandum and signed the document.

After returning from his suspension, Young made another complaint of racial discrimination in connection with a November 30, 2007, email from NLU's Vice President of Operations, Bill Roberts. On November 29, Young notified Roberts via email that a thumb scan machine had been malfunctioning and stated that he would await further instructions from Roberts on this issue. Roberts emailed Young the next day. In the message, he expressed frustration with Young and asked "[i]s the staff at Chicago afraid to make a decision and make a call for help? If so, let's get over it and start managing that property appropriate[ly] before you guys push me past the

'annoyed' stage." On December 3, Young complained to Human Resources that Roberts' email was racially discriminatory, inappropriate, and threatening. Roberts emailed an apology to Young on December 6. Although Young indicated that Roberts' "apology had calmed the situation enough for me to be able to move ahead" in an email to Human Resources, he nevertheless asked for further investigation as to the motivation for the language and tone of Roberts' email.

After several incident-free months, another issue arose between Young and members of the NLU faculty in September 2008. On September 17, 2008, NLU faculty members Christina Nolan and Karen Koch came to Young's office to express their unhappiness with the manner in which Young handled an equipment request. Young notified his supervisors regarding the complaint. In his report, Young took issue with a statement Nolan made in his presence. When Young remarked that Nolan did not have to employ hand gestures in expressing herself to him, Nolan (who is white) pointed to Koch (who is also white) and responded "this is how we speak in our culture[.]"

After learning of the complaint made by Professors Nolan and Koch, another NLU Professor, Christopher Clemmer, sent an email on September 17 complaining about the "scheduling chaos" in Young's department and the behavior of the facilities staff. The email was sent to several members of NLU's Chicago campus staff, including Young's brother Patrick and his supervisor Bill Roberts.

On September 18, Patrick Young sent an email to the Chicago listserv responding to the complaints made by Clemmer and Nolan regarding the facilities staff. When Young arrived at work later that day, he twice attempted to reply to his brother's email and send his response to the entire Chicago campus. Young was ultimately unable to use the Chicago campus listserv to voice his concerns; NLU officials had restricted access to the Chicago campus-wide listserv earlier that day in order to prevent further unauthorized use of the email list. After twice attempting to send the emails, Young met with his supervisors and threatened to send his response to every NLU employee on an individual basis if he were not allowed to respond using the campus-wide listserv. After the meeting, Young notified NLU that he was leaving work due to mental distress and began a leave of absence. During his leave of absence, Young submitted complaints to NLU regarding perceived racial discrimination on the part of Nolan and Clemmer as well as retaliation on the part of his supervisors Roberts and Sterett.

On October 2, 2008, Holly Battaglia, a NLU Human Resources employee, emailed Young to remind him that he had to submit his Family Medical Leave Act ("FMLA") paperwork by October 8. She also noted that failure to turn in the appropriate documents by that date could result in disciplinary action. The next day Young submitted another complaint to NLU alleging that NLU's Human Resources had retaliated against him for reporting racism. Finally, on October 6, 2008, NLU placed

Young on paid administrative leave while they investigated whether his actions violated University Policies and the Expectations Memorandum.

Haulotte was put in charge of the investigation into Young's conduct on September 18. She met with Young on October 8, reviewed various NLU policies, examined the Expectations Memorandum signed by Young, and looked over email correspondence between Young and various NLU staff members. After her examination, Haulotte recommended that Young be terminated for violations of the Expectations Memorandum and for his disregard of appropriate notification processes. Bergmann, Roberts, and Johnson agreed with the recommendation; NLU President Pappas consulted with the decision and approved the termination. On October 20, NLU terminated Young's employment stating that his attempts to distribute a campus-wide email communication constituted a misuse of NLU's IT systems and a violation of his University Expectations memo.

Young filed another charge with the EEOC on October 24, 2008. In his second EEOC filing, he alleged that his termination had been in retaliation for having filed his first EEOC charge in September 2007. On June 10, 2009, the EEOC issued a notice of right to sue as to the first charge and then issued a similar notice for the second charge a week later. Young filed suit against NLU on July 16, 2009, asserting claims for race

discrimination, racial harassment, and retaliation under Title VII and 42 U.S.C. § 1981.

Defendants now move for summary judgment as to all claims.

## LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to summary judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when the evidence is such that a reasonable jury could find for the nonmovant. *Buscaglia v. United States*, 25 F.3d 530, 534 (7th Cir. 1994). The movant in a motion for summary judgment bears the burden of demonstrating the absence of a genuine issue of material fact by specific citation to the record; if the party succeeds in doing so, the burden shifts to the nonmovant to set forth specific facts showing that there is a genuine issue of fact for trial. Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). In considering motions for summary judgment, a court construes all facts and draws all inferences from the record in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). With these principles in mind, we turn to NLU's motion.

## DISCUSSION

Young asserts claims of race discrimination, racial harassment, and retaliation under Title VII and 42 U.S.C. § 1981[1]. We will discuss the merits of NLU's motion with respect to each of Young's claims separately.

### I.     Race Discrimination Claim

NLU contends that Young's race discrimination claim fails as a matter of law because the conduct upon which his claim is based does not constitute an adverse employment action. A plaintiff may prove intentional discrimination in violation of Title VII using either the direct or the indirect method. *Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1011 (7th Cir. 2004). Young elects to proceed using the indirect method and relies on the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To establish a prima facie case of discrimination under the indirect method, Young must show that (1) he is a member of a protected class; (2) he was meeting his employer's legitimate expectations; (3) NLU took an adverse employment action against him; and (4) his employer treated similarly situated individuals outside of his protected class more favorably. *See, e.g., Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 545 (7th Cir. 2002).

---

[1] Both Title VII and § 1981 actions are assessed using the same rubric. *See Williams v. Waste Mgmt. of Ill., Inc.*, 362 F.3d 1021, 1028 (7th Cir. 2004). Therefore, we will employ one analysis to examine Young's claims under both statutes.

In presenting his race discrimination claim under the indirect method, Young argues that NLU took an adverse employment action against him by neglecting to move him to a different office immediately following the May 2007 flood. "A materially adverse employment action is something more disruptive than a mere inconvenience or an alteration of job responsibilities." *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (internal quotation marks omitted). Typically, an adverse employment action consists of a change in an employee's financial terms of employment or a transfer of the employee to a new job that reduces the employee's career prospects. *See O'Neal v. City of Chicago*, 392 F.3d 909, 911 (7th Cir. 2004). However, actionable employment action may also be present when "the conditions in which [an employee] works are changed in a way that subjects her to a humiliating, degrading, unsafe, unhealthful, or otherwise significantly negative alteration in her workplace environment." *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 780 (7th Cir. 2007).

Young has not presented enough evidence for a reasonable juror to conclude that NLU's failure to move him to a different office immediately following the flood constituted an adverse employment action. Young has not put forth anything to suggest that the conditions in his office rose to the requisite level of severity necessary to support a claim for racial discrimination. The mold sampling report issued by the environmental consulting firm who examined Young's office found nothing unsafe or

unhealthy in the conditions of Suite 3114 and indicated that mold levels in the workspace were normal. Though occupying an office in the vicinity of a garbage can full of stagnant water and a dehumidifier could certainly be considered unpleasant, we do not think that such conditions constitute a sufficiently significant negative alteration in Young's workplace environment such that NLU could be held liable under Title VII. Because Young has failed to present sufficient evidence of an adverse employment action, his claim fails as a matter of law.

## II.     Racial Harassment Claim

NLU also argues they are entitled to judgment as a matter of law on Young's racial harassment claim because he has not presented enough evidence for a reasonable juror to find he was subjected to a hostile work environment. In order to establish a claim of racial harassment, Young must show that (1) he was subject to unwelcome harassment; (2) the harassment was based on his race; (3) the harassment unreasonably interfered with his work performance by creating an intimidating, hostile, or offensive working environment that seriously affected his psychological well-being; and (4) there is a basis for employer liability. *Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 476 (7th Cir. 2004). When determining whether a hostile environment exists for racial harassment purposes, the court must examine the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, whether it is physically

threatening or humiliating or a mere offensive utterance, and whether it unreasonably interferes with an employee's work performance. *See AMTRAK v. Morgan*, 536 U.S. 101, 116 (2002).

Young predicates his harassment action upon evidence of the following conduct that occurred over the course of a year: (1) Slawson's repeated verbal complaints and one instance of intimidating behavior; (2) NLU's response to the Slawson situation; (3) failure to immediately remove Young from his office after the flood; (4) moving Young to a different room than an employee who was not African-American; (5) Roberts' email expressing his annoyance at the facilities management department's failure to work independently; (6) failure of McCeil Johnson and Erin Haulotte to properly investigate Young's complaints of racial discrimination; (7) in-person complaints from NLU faculty members Christina Nolan and Karen Koch including Nolan's comment regarding hand gestures; (8) NLU faculty member Christopher Clemmer's email criticizing Young's performance; and (9) NLU administrators prohibiting him from distributing an email in his own defense to the Chicago campus listserv.

Even when construing the evidence and making all inferences in a manner favorable to Young, he has not put forth enough facts for a reasonable person to find that he suffered from a hostile work environment at NLU. The behavior Young highlights as evidence of discrimination may more accurately be described as run-of-

the-mill workplace friction. *See Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303

(7th Cir. 2004). Though some of the behavior of certain NLU administrators and faculty

members may be characterized as rude or insensitive, such conduct is insufficient to

sustain an actionable claim for racial harassment. *See Baskerville v. Culligan Int'l Co.*,

50 F.3d 428, 430 (7th Cir. 1994). Because Young lacks sufficient evidence of a hostile

work environment, his racial harassment claim fails as a matter of law.

## III.    Retaliation Claim

NLU also argues that they are entitled to summary judgment on Young's

retaliation claims. A plaintiff may use either the direct or indirect method to prove his

retaliation claim. *Poer v. Astrue*, 606 F.3d 433, 439 (7th Cir. 2010). Young elects to

proceed under the direct method. Under this rubric, he must show that (1) he engaged

in a statutorily protected activity; (2) an adverse employment action was taken by NLU;

and (3) there is a causal connection between the two events. *Sitar v. Ind. Dep't of

Transp.*, 344 F.3d 720, 728 (7th Cir. 2003).

NLU argues that they are entitled to judgment as a matter of law on the portion

of Young's retaliation claim based on his 2008 termination because he has not

submitted evidence that he engaged in a statutorily protected activity. Title VII prohibits

an employer from discriminating against an employee for opposing a practice

proscribed by the statute. 42 U.S.C. § 2000e-3(a). In order for a plaintiff's complaint

to constitute protected activity, the plaintiff must reasonably believe in good faith that the practice he opposed violated Title VII. *Fine v. Ryan Int'l Airlines*, 305 F.3d 746, 752 (7th Cir. 2002). Utterly baseless allegations are not covered by Title VII. *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994).

Young argues that he engaged in two forms of statutorily protected activity prior to his termination: (1) his attempts on September 18, 2008, to send an email to the entire NLU Chicago campus responding to various NLU faculty members' alleged racial harassment in the form of criticisms of his work performance; and (2) his email to NLU on October 3 asserting that Battaglia's request for FMLA paperwork constituted retaliation for his prior complaints about discrimination. Neither of Young's complaints referenced conduct that could be reasonably construed as violating Title VII and cannot be considered protected activity. Young's September 18 emails targeted statements made by various NLU faculty members regarding deficiencies in Young's work performance. The critical statements were not related to Young's race but rather to Young himself and cannot be reasonably construed as racial harassment. *See Herron*, 388 F.3d at 303 ("His problems were not related to his race–they were related to him . . . [t]his alone dooms his racial harassment claim"). Nor could Young reasonably believe that Battaglia's October 2 email constituted retaliation. Battaglia took no adverse employment action; no reasonable person could consider a request for

additional paperwork and a warning that failure to comply would result in disciplinary action as retaliation prohibited by Title VII. Young has not presented any evidence to support a finding that he engaged in protected activity prior to his termination. Therefore, NLU is entitled to judgment as a matter of law on this portion of Young's retaliation claim.

NLU is also entitled to summary judgment on the portion of Young's claim related to his 2007 suspension because Young has not presented enough evidence of a causal connection between his complaints of alleged discrimination of NLU and his three day suspension in September 2007. The uncontroverted facts demonstrate that Young exhibited condescending and rude behavior during his August 31 meeting with Pappas and Johnson and that NLU predicated their decision to suspend Young upon his insubordinate behavior. Young's only evidence of causation is the temporal proximity between his filing of complaints and his suspension. This alone is insufficient to support a finding of a causal connection between the two events. *See Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cir. 2010). Because Young has failed to identify a genuine issue of material fact on the causation issue, summary judgment is also appropriate as to this aspect of his retaliation claim.

Young's retaliation claim would also fail even if he elected to proceed under the indirect method. To establish a prima facie case of retaliation under the indirect method,

Young must demonstrate that he engaged in statutorily protected activity, met his employer's legitimate expectations, suffered an adverse employment action, and was treated less favorably than similarly situated employees who did not engage in protected activity. *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 903-04 (7th Cir. 2005). Young has not presented any evidence that he was meeting NLU's employment expectations before his suspension in 2007 or his termination in 2008. The uncontested facts show that Young behaved in a rude and insubordinate manner toward his supervisors at NLU; an employee that conducted himself in that way does not meet his employer's legitimate expectations. *Everroad v. Scott Truck Sys.*, 604 F.3d 471, 478 (7th Cir. 2010). The uncontradicted evidence of Young's defiance effectively prevents him from establishing a prima facie case of retaliation. Even if Young had established a prima facie case of retaliation, however, his inability to present evidence of pretext would nevertheless prove fatal to his claim. Young has not pointed to any specific facts that would place NLU's explanation for his suspension and termination (i.e., his insubordinate behavior) in doubt such that summary judgment would be inappropriate. *See Culver v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir. 2005). Based on the lack of evidence presented on these two crucial issues, we conclude that Young's claims would fail as a matter of law under the indirect method.

**CONCLUSION**

NLU's motion for summary judgment is granted.

Charles P. Kocoras
_____
Charles P. Kocoras
United States District Judge


Dated: ___August 31, 2010___